We'll hear argument next in No. 19-2372, Propharm Inc. v. WisTa Laboratories Ltd., Mr. Ricciuti. Thank you, Your Honor, and may it please the Court, Christopher Ricciuti on behalf of the appellant, Propharm. This appeal stems from two IPRs filed by appellant where the board's patentability conclusion rested on two fundamental errors. The first regarding the board's assessment of the scope and content of the prior art, and the second regarding the board's application of the reasonable expectation of success analysis. Mr. Ricciuti, Judge Moore, before you get into the merits of the appeal, could I ask you to focus for a second on standing and tell us your standing argument? Yes, Your Honor, thank you, and that is exactly where I wanted to go first. There is the threshold issue regarding appellate standing, and so I think it is appropriate to start there. On that issue, in view of the party's 10-year negotiation history, WisTa's refusal to license these patents to Propharm, and Propharm's ongoing methylene blue commercial activity, Propharm has standing to appeal. WisTa's position, contrary to that, is based on two faulty IPRs. Why is your commercial activity potentially infringing? As I understand it, under the NDA, it only calls for 97% purity rather than 98% purity, and I don't see how compliance with the NDA creates infringement or a risk of infringement. Yes, Judge Dyke. So the FDA's methylene blue monograph requires the purity for compliant methylene blue API to be at least 97% pure, and the claims require 98% pure. But if I would refer the panel to Appendix 6612 of Paragraph 18, that's the declaration from Mr. Newman in this case of Propharm, he states there that the target purity of Propharm's methylene blue API has to exceed 97% to be compliant with the FDA standard. So certainly Propharm goes above 97% in order to ultimately make methylene blue API. Counsel, Counsel, doesn't Mr. Newman go further than that? He points to the 942 and the 850 patents, which he explains cover the method by which you, in fact, make your product, and that both of those say that the method being used produces a degree of purity greater than 97%, preferably greater than 98%, or even better than 99%. So don't we know from Mr. Newman's declaration that the very process you used, which is detailed in two separate patents, produces a purity higher than 97%, and preferably higher than 98% or 99%, and doesn't that meet, in your mind, the minimum threshold for standing? I mean, I guess it would be hard for me to say, go ahead, you have to admit you infringe in order to have standing. That's the hard thing. You're between a rock and a hard place on that one. Absolutely, Your Honor, and I think that's exactly right. There is no requirement to admit to infringement. Recently I would point the panel to the court's decision in Mayborn v. ITC, which is 965 F1350, where a potentially infringing a patent in question was enough to confer appellate standing from an ITC general exclusion order, and we think the analysis should be the same here for the point exactly that you raised. We certainly know that Prufarm's process is capable of making API that exceeds 97%. The facts are not in the declaration as to, in the exact real-world commercial embodiment, what that percentage gets up to, whether it's exactly consistent with the patents or not, but that's exactly our point is that we have a process where the overall methylene blue purity is going to be greater than 97%, so very close, at minimum, to the claimed 98% purity in order to meet the FDA monograph standards. Tell me again, how do we know that it approaches 98%? What Mr. Newman said in paragraph 18 is that their process has to exceed 97%. Which page? APPX 6612 at paragraph 18. Well, counsel, to be clear, what I was referring you to is at 6613, paragraph 20, where he explains how your process is actually created by the process described in the 942 and 850 patents, and that patent suggests a higher concentration than even his prior paragraph. Thank you, Judge Moore. Absolutely it does, and that is consistent with the prior paragraph in paragraph 18. My only, I guess, point there was, in Mr. Newman's declaration, he hasn't stated exactly how the patent correlates to the real-world ultimate percentage purity of methylene blue API, and so certainly I think the process is capable of exceeding 97%. No, no, no, counsel, counsel, counsel. The process can't be capable of exceeding 90%. According to your patent, it has to exceed 97%. You have two patents, the 942 and 850. You say that your commercial product is made by the process articulated in those two patents. Those two patents don't cover something that might exceed 97%. They require it to exceed 97%. What am I missing? That's correct, Your Honor. That's correct. But what evidence did you submit that the differences, and it's more than just the methylene blue purity level, that there are other gaps between the FDA requirements and the claims of the patented issue? So what evidence did you submit that objectively those differences are really meaningless? This is Judge O'Malley, correct? Yes. Thank you. I know. I know. We all sound alike. When you look at the FDA's requirement, the ASER A and C limits, when you meet the FDA requirement, you're necessarily going to meet the claimed requirements for those impurities. So the two impurities that we believe are potentially relevant in terms of potential gaps for standing relate to ASER B and MVB. The claims say for ASER B less than or equal to 1%, the FDA requirement is less than or equal to 2.5. And then for MVB, the claims say less than or equal to 0.05%, the FDA requirement is less than or equal to 0.1%. And so it's ProPharm's position that we're looking at standing here and not the ultimate infringement merits. And it may be the fact that ProPharm's requirement, while compliant with the FDA monograph, may not ultimately infringe the ASER B or MVB limits. But at this stage, when we're talking about standing, those potential gaps shouldn't preclude review, particularly given the fact that any time the FDA requirements are close to the patent limitations, we should say there has to be standing? Well, I don't know if it needs to be some sort of quantitative look at how close you get to the patent claims themselves. But looking at what the court said in Mayborn, if you're potentially infringing the patent in question, that should be enough. And we believe here that where you necessarily have to meet the ASER A and ASER C limits of WESTA's claims in order to be FDA compliant, we have a process that absolutely exceeds 97% and per the patents could be beyond that. Look at the chart on page 36 of the red brief. Help us here because they admit that the ASER A and ASER C requirements are met. But they say that with respect to ASER B and MVB, there's a gap. What's your answer to that? And the answer there, Your Honor, is that while there may ultimately be a gap in terms of the ultimate infringement proof, that we do not believe there needs to be an admission of infringement in order to close that gap for the purposes of standing to get there. That's true, but we're not talking about admitting infringement. We're talking about pointing out that your process creates a risk that you would be sued for infringement. And you've discussed the 97% as being close to the 98%, but I'm asking about these other two items that apparently there's a gap. And what did your affiant say, if anything, about whether there was a likelihood that you would come close or exceed these other limitations? Yes, Your Honor. And I do not believe that Mr. Newman in his declaration addressed quantitatively how close the process, number-wise, gets to that gap. Counsel, this is Judge Moore. Judge Newman said that your products are made by particular patents. Those patents articulate a percentage of purity which exceeds the minimum required by the FDA. So didn't he, in fact, give testimony that suggests that your patents and the products it produces are not just at the bare minimum level required by the FDA, but, in fact, have a greater purity than what's required by the FDA? And this is where there may be the ultimate disconnect between the patents and what Mr. Newman said in Paragraph 20 of the Declaration, Appendix 6612 to 6613. That is certainly what the process can do according to that patent, and I just don't think the facts exactly are in the record in terms of what the ultimate API that, for instance, gets incorporated into ProveyBlue, the product that's sold in the U.S., what that purity exactly looks like before it is incorporated into ProveyBlue. What do we do with the fact that, obviously, this has been aware of your activities for 10 years. You say you've been on the market for three years, and there's never been so much as a threat of an action against you. And so here I think you have to look at the totality of circumstances and that while there hasn't been an explicit threat, I think it's certainly the circumstances here tantamount to an overt threat where the parties have engaged in numerous discussions and disputes over the or negotiations, excuse me, over the past 10 years to resolve their underlying patent dispute. It got to the point where the parties were discussing licensing in order to obviate, you know, exactly what we're going through now and potential disputes in the future, and at least this ceased all communication and stopped. Well, that's after you threatened them, right? There was indications that if there couldn't be, you know, certainty so that there wouldn't be certainty around the Methylene Blue business, that ProPharm may have to file opposition proceedings. But they offered you a non-assert. They were not actually offered. It was suggested that that would be their preferred path. ProPharm responded saying that they didn't believe that that would be adequate. They wanted additional reasons why they thought a cross license would be better, and then that's when we used to stop communications. Counsel, I know your time is up, and hopefully Judge Dyke will be generous and restore a little rebuttal time since I'm using part of that time. But this is Judge Moore. I have a question, and the question is, I'm not asking you to admit that the Doctrine of Equivalence could in fact apply here, because, again, that would be tantamount to admitting to asking you to admit infringement. So I'm not doing that. But isn't it possible that even your process requires you to be higher than 97%, which is in fact higher than the FDA guideline and closer, therefore, to the minimum 98% threshold. Isn't it possible that, say, if you're at 97.6% or 97.7%, that they could, if not a literal infringement claim, they could make a claim against you under the Doctrine of Equivalence? I mean, to your knowledge, have we ever said that for standing purposes, you have to be within the range for literal infringement? Not to my knowledge, Your Honor. I've looked at a lot of the recent standing cases in preparation for today's discussion, and I do not recall that, and that's certainly a possibility that WESTA could argue if they ultimately file a district court action. But it's not a possibility that you argued in this case, right? It was not in the briefing the Doctrine of Equivalence point. I do not believe so, Judge Dyke. You argued, didn't you, that they could sue us for infringement, right? Absolutely, and that's the basis of our standing argument, is that in view of the totality of the circumstances here, the threat of an infringement suit is absolutely a possibility, given the overlap between the FDA requirements and our patented process and our API manufacturing process. Okay. Unless my colleagues have further questions about standing, I think we'll give you a couple of minutes to discuss the merits. Absolutely. Thank you, Your Honor. So turning to the merits, the first issue regarding the scope and content of the prior art, the point that I would like to make there is that the Board collapsed its entire analysis into one perceived mistake in the petition, namely the Board's determination that the European pharmacopoeias and Ackerman's disclosure of a methylene blue percentage did not refer to methylene blue purity. And while ProPharm does not challenge this finding, we believe that the real error is the fact that the Board ignored the following evidence I'm about to summarize once they identified one error in the petition. Is it your theory, are you saying that the actual level of purity of those prior art products was irrelevant to the obviousness theory that you asserted in your petition? No, not that it was irrelevant, but that if there was one petition or position by ProPharm that the Board ultimately disagreed with, that the analysis cannot stop there and they have to still consider the full petition and the evidence that was put in there and what the true scope and content of the prior art is. And we're certainly not asking the Board to play archaeologist with the record here, but if you look at Wieste's patent itself at Appendix 147, Table 3, it states that the starting purity of Medex methylene blue was 93.76% pure. And then, for example, if you look at Dean, which was the primary reference that was used in every single ground of unpastability, it reports that the purity of methylene blue is 95.4% pure. This was relied on in the petition at Appendix 216, and I would also refer the panel to Appendix 767, Lines 8 to 15, where Wieste's counsel before the PTAB during argument agreed that that 95.4% figure was a purity figure. So we're talking about the purity of known methylene blue in the prior art. By the time we get to Wieste's patent in 2006, it is clear and undisputed that anywhere between 91% and ultimately up to 96%, which I am getting from Appendix 5756 to 5755, which was earlier Wieste's testing associated with the U.K. patent application, that purity range was known in the prior art. The scope and content of the prior art was established, and then the only question became a reasonable expectation of success. And to that point, reasonable expectation of success, what was the board supposed to do with all the comments that you've made to patent offices around the world about methylene blue being so hard to purify? Should those have been ignored? I don't think those should have been ignored, but they need to be taken in the proper context. And those statements were not made, and specifically, I believe, Your Honor, is referring to the 850 patent and the European equivalent of the 850 patent. Yes. And those statements were made in the context of proof-of-claims where not only did it recite a high level of organic impurity but also a very low level of metallic or inorganic impurities, which is not the same case with the independent claims of Wieste's patent. And so those statements were directed at using conventional techniques to get rid of both at the same time, not that if we're simply looking at the independent claim, for example, and we want to purify via HPLC, preparatory HPLC, that is, would there be a reasonable expectation of success? And so in some regards, I think they were comparing apples to oranges because the claims and the technology was different enough that it would make a meaningful distinction to a person of ordinary skill. Okay. I think we're out of time. We'll give you two minutes for a rebuttal, and we'll hear from Mr. Speed. Thank you, Your Honor. Good morning, Your Honor. Nathan Speed on behalf of the appellee at Wieste Laboratories. These appeals should be dismissed because the appellant proof-of-claim failed to demonstrate it had standing to bring them. If, however, the merits are considered, then this court should affirm because the record amply supports the Board's factual determination and the Board committed no legal errors. I'll start with the standing issue. Yeah. What more do you think that Proof-of-Arm had to allege to establish its standing? Thank you, Your Honor. I think in light of the EI DuPont case, the case that Proof-of-Arm relies on heavily in its briefing, that type of allegation where, in that case, DuPont alleged that it had a plant that was operational and had the capability of manufacturing within the claim parameters of the challenged patent, that type of evidence, if it existed, if Proof-of-Arm had submitted that, then that might have been sufficient in light of DuPont to demonstrate standing. Counsel, this is Judge Moore. Under the DuPont case, if they had a plant and a process that was capable of infringing, that might be enough. Well, they expressly allege in their President, Mr. Newman's declaration that they produced their product by virtue of the process in the 942 and 850 patents, and that that process, when you read the patent, produces a product that has greater than 97% purity, preferably greater than 98% or 99% purity. So why haven't they met the burden that they, in fact, do have the capability of producing an infringing product by virtue of the process they're using, since that is, in fact, the preferred embodiment in the patent disclosed that they say they're actually using to produce their product? Thank you, Your Honor. A handful of responses there. One, I believe opposing counsel admitted that there is no connection necessarily between how approval glue is actually manufactured in the real world and how in the preferred embodiment of the patent. But more to the point, the patents that are referenced in paragraph 20 of Mr. Newman's declaration relate just to the purity level of methylene blue, but they don't discuss the organic impurities, azure B, AAC, and MVB, that are recited in the WISDA claims. So the WISDA claims are not just focused on the purity level of methylene blue. It's the purity level of methylene blue, along with specific purity levels for other organic purities. And most notably, the WISDA claims require less than 1% of azure B, whereas the FDA permits approval glue to include 2.5 times as much of that impurity, azure B. And so that gap there between the WISDA claims and the FDA requirements for approval glue is a sufficient gap to make it an unreasonable allegation of infringement based on the record that we have here. It's a difference between 1% and 2.5%. Is that meaningful in the art? I think we can take proof of our own statements to the U.S. Patent Office and the European Patent Office as to the difficulties associated with using conventional techniques to purify methylene blue and separate it from or purify it from its organic impurities, such as azure B, azure A, and azure C. To the European Office, they told the European Office that it was impossible using conventional processes to do that. What would you have them say? That they are capable of doing all of that? Is that what they would have to say? I think going to this court's opinion in the JTEKT Corporation decision, they don't need to concede current infringement, but they do need to establish, quote, that it had concrete plans for future activity that created substantial risk of future infringement or likely caused the patentee to assert a claim of infringement. Here, had they submitted a declaration that said that they have a plant that is currently capable of producing proof of blue within the various ranges of the claims with the patents, that might have been sufficient. I think it's important to remember that the burden is on Prover Farm to demonstrate on appeal that it has standing to take reversal of the board's decisions. They have all the information in their possession. They either don't actually have the capability to meet the limitations recited in the WISDA patents, or they've made the strategic decision not to introduce the evidence that would establish that. Respectfully, we believe that they should be held to the consequence of that strategic decision, which would be that the appeals are dismissed for lack of standing. Counsel, you suggested that one of the problems with their proof is that, for example, when it comes to ASER-B, one of the organic materials, the claims require it to be at 1% or less. Is that right? Correct. And that they haven't specifically alleged or provided proof that their product is at or less than 1%? Is that the nature of the argument? I'm just making sure I understand it. Correct. Paragraph 20 of the Newman Declaration just focuses on that methylene blue purity level. Right. But the patent, the two patents that paragraph 20 expressly relies on, says the most preferred embodiment has a 99% or a greater than 99% purity of meth blue. So if the meth blue has to be greater than 99%, doesn't that necessarily exclude one or more percent of ASER-B being included? I mean, I can count the percents, and they've got to add up to 100. That would be correct, Your Honor, if we had any evidence in the record that Proof-of-Farm was manufacturing Proof-of-Blue using that preferred embodiment. If that was true, it would seem that Proof-of-Farm could have added a paragraph to Dr. Newman's declaration to expressly state as much, and then we wouldn't be in this situation debating or speculating as to what type of process they're using. This is information in the document. No, please continue. I was just trying to establish that this is information entirely within their control, and they chose strategically to only cite to a patent and suggest that their process is based on that patent without explaining which of the embodiments. Go ahead. Okay, so I have two problems with what you're saying. Before you said the standard is they have to be capable. Now you're requiring proof that they do, in fact. And so, I mean, I feel like you've raised the level of proof in response to my very specific question, so that's kind of point number one. But point number two that I'd like to raise with you is that Paragraph 20 expressly says that they're preparing Proof-of-Blue, or however you call it, based on the process for preparing methylene blue described in the 942 patent, and then the compound is claimed in the 850 patent. And that patent expressly says that the most preferred embodiment is the 99% or greater purity. So if they're using a process that they have described in detail in a patent that's capable of producing meth blue at greater than 99% purity, why isn't that enough? You said the standard was capable of. They said this is the process we're using. Here's the patent, and the patent describes the preferred embodiment as producing greater than 99% purity. I think, Your Honor, the fact that they haven't alleged that they're actually using that preferred embodiment... No, but you didn't say, Counsel, you didn't say they have to allege that they're using that preferred embodiment. You said our standard, which you were right about, is they're capable of doing it. They are, Your Honor, they're capable in the sense of having provided it in their patent specification, but whether or not they're actually commercially capable of doing it, that's the missing link here. We don't know if they're actually capable of achieving those purity levels. Well, capable can't be the only test. There has to be some plan to do something which might infringe. I mean, anybody could be capable of doing something. That seems to me perhaps not enough to give you standing. I would agree, Your Honor. In this case, just simply by describing... I would assume you would agree. There was no actual question in there. But let's go back to something else. Why do you think they would spend 10 years negotiating with you over this if they weren't planning to or didn't have the capacity to infringe? Why would you bother spending... If you're really, really close, because they are really, really close at a minimum to the bottom threshold because they're using a process which requires the production to be over 97%, and then their preferred embodiment requires it over 99%. So just out of curiosity, what do you think would motivate a company to spend 10 years negotiating for a patent license if they weren't capable of infringing? Your Honor, I would push back on the idea that they'd spend 10 years of negotiation. They approached WISDA in 2010 and 2011, which would have been 6 years before the first WISDA patent even issued. And they wanted to enter into a business agreement, and PruvaPharma and WISDA never reached that agreement. And then they had no further communications for 4 years, from 2011 to 2015, when at that point, PruvaPharma again approached WISDA and the parties had some initial discussions during which PruvaPharma sent their draft cross-license. And when WISDA said that they weren't interested in the draft cross-license, PruvaPharma's response was to threaten WISDA to encourage them forcefully to enter into the business deal. And WISDA broke off conversation at that point because they had been threatened, and then we had these IPRs that were filed. So there hasn't been a decade's worth of discussions between the parties where these patents were of critical importance. This has been a story in which PruvaPharma has twice reached out to WISDA to try to get us to enter into a business deal with them, and we said no, and their response was to challenge our patents before the PTAB. Unless there are further questions about standing, perhaps you could take a couple minutes to address the merits. Yes, Your Honor. As the board summarized at pages 19 to 20 of its decision, PruvaPharma's petitions were based on two factual pillars. PruvaPharma first alleged that high-purity methylene blue with greater than 98% purity was already known and commercially available as a prior art, and second, that starting with such a high-purity composition of POZO would have had a reasonable expectation of success in using conventional HPLC to purify the composition well beyond the claimed ranges. As the board noted, PruvaPharma alleged there would be, quote, nothing challenging with using HPLC to purify methylene blue. The board correctly found that PruvaPharma's argument suffered from two fundamental and independently dispositive factual flaws. First, from pages 20 to 32, the board explained that PruvaPharma had failed to prove the scope and content of the prior art as alleged in the petition.  that disclosed percentages of 98% or greater, the board found after a detailed assessment of the records that none, not a single one of the percentages actually cited in the petition evidenced the existence of high-purity methylene blue. They didn't refer to purity. The board's analysis... What is your response to their argument, though, that even though that might be the case, the board still should have analyzed all of the prior art cited for purposes of deciding what it did disclose, even if it didn't disclose exactly what the petition said it did? Thank you, Your Honor. The response there would be that within the IPR process, the petitioner has complete control of the petition, and they're bound to the arguments that they actually set forth in the petition. And there was no distinct argument set forth in their petition that a POSA, rather than starting with high-purity methylene blue, would have started with methylene blue of any known purity and, therefore, achieved the purity limitations decided in the WISDA claims. Indeed, page... Appendix 217, when describing the Dean reference that Counsel for Approval for ARM mentioned in his opening argument, they described Dean's 95.4% pure methylene blue, which would be a specific purity level that was identified in the petition. They described it as a disadvantageous starting point and then explained that, quote, commercial methylene blue was cheaply available by the time of the invention at 97% to 99% purity, meaning that purification would have been even easier than at the time of Dean. And so they clearly premised their entire petition, the scope and content of the prior art, on the existence of high-purity methylene blue. And the contention now that, on appeal, that they had a more generic argument that was based on simply any specific purity level being known in the art just doesn't match with what the petition actually said. Indeed, there's a section in the petition called Content and Scope of the Prior Art in which they have, on Appendix 225, they explicitly say high-purity methylene blue compositions were known. They talk about those compositions comprising greater than 98%. They then cite four exhibits, each of which has a percentage that's quoted that's 98% to 103%, and they conclude that that is, quote, that the methylene blue compositions comprising 98% or more were commonly known and suggested in the art. So that was their petition. They had complete control of the arguments that they were going to submit in that petition, and they defined the prior art as having high purity of 98% or more. Okay, but let's assume that they had a starting point around 94, something like that. Let's assume, just hypothetically, that they had that. Isn't there a problem with the HPLC getting you to 98%? Yes, Your Honor, and that's the second basis that the board identified in its decision, which was that they failed to prove that conventional HPLC would have allowed you to go from a 94% purity to the claim purity levels recited with these claims. My understanding is that they're claiming that the analytic HPLC would allow you to detect 98% purity. Am I understanding that correctly? That is how the board and our expert explained analytical HPLC, which is what the dean referenced as the basis of their two grounds. Dean disclosed an analytical process. In Proof of Performance Petition, they pointed to the fractions that are depicted in Deans Figure 6A to 6H and Figure 8G and conclusively stated that those were purified components of methylene blue. But in reality, as our expert explained and the board agreed, the fractions actually contain methylene blue combined with an alleolate having significantly greater amounts of glycine and other impurities than methylene blue. That's the board quoting our expert at page 40 of the decision. They focused their petition on references that just disclosed an analytical HPLC process and didn't explain how you would go from observing methylene blue in fractions from an analytical process to actually obtaining isolated pure methylene blue. On page 41, they cited Dr. Sesler, which is an expert, who explained that that process going from the fractions in a chromatogram to actually obtaining pure methylene blue was exceptionally difficult, perhaps chemically impossible. And that's paragraph 134 of his declaration, which they cited at page 41. And that statement from our expert is completely consistent with the position that Proof of Performance took before the U.S. Patent Office, where they said that in 2006, then-existing purification techniques inevitably produced impurities, and the position that they took repeatedly in front of the European Office, in which they said that then-existing conventional techniques such as HPLC made it difficult or impossible to actually separate methylene blue or isolate methylene blue from its organic impurities. Okay. Unless there are further questions, I think we're out of time. Hearing none, Mr. Rashidi, you have two minutes. Thank you, Judge Dyke. I would like to make two points on the merits with the remaining time that I have. The first regarding the scope and content of the prior art and starting methylene blue purity. If you look at Appendix 31, which is the Board's final written decision, which quotes directly from Proof of Performance petition at Appendix 239 to 240, the Board summarized our position regarding the scope and content as following, and that an ordinarily skilled artisan would have conducted routine experimentation, starting with a methylene blue composition such as 95% methylene blue or 99% methylene blue, and ultimately arrived at or cited at least 98% methylene blue using HPLC. That 95% methylene blue is deemed that's disclosed in the prior art, and this goes to the Board finding what they believe to be one mistake as a higher percentage, 99% being disclosed, and then they stop their analysis there. They recognize that we said there were lower purities that could be further purified, such as 95%, and that's deemed, and then it gets us to the reasonable expectation of success analysis, and this is where the Board just didn't understand and appreciate ProPharm's argument and the distinction between analytical HPLC and preparatory HPLC, and you can see this clearly at Appendix 40, where the Board states that accredited and agreed with Dr. Sesler's testimony that analytical HPLC process disclosed in DEAN would have produced an elutant with impurities other than methylene blue, but ProPharm never argued otherwise, and importantly, we've never argued that the exact analytical HPLC processes that are disclosed in DEAN would have to be bodily incorporated into the obviousness combination, into the hypothetical HPLC protocol to get to successful isolation. What ProPharm says is that preparatory HPLC is common in the art, and preparatory HPLC, the whole goal, is to isolate the methylene, what you are separating out of the HPLC column so that you can then use it, and with that goal in mind, a person of ordinary skill would have selected an appropriate mobile phase that would have allowed for successful isolation after separation and purification. When that was rebutted in the patent owner response by Wiesta saying, well, no, you need to be stuck with exactly what's in DEAN, ProPharm's experts said, okay, even if the obviousness analysis required that type of plug-and-chug bodily incorporation, which it doesn't, all you would have to do is look at DEAN's Figure 1. DEAN's Figure 1 is a completely volatile mobile phase, so that when the solvent, when the thing that comes out of the HPLC column evaporates, you're going to be left with your purified and isolated high-purity methylene blue. That argument... Mr. Roche, I think we're out of time. Apologies, Your Honor, and thank you, and so we would ask that the case be remanded so the Board can consider the reasonable expectation of success analysis in view of the full body of prior art, and thank you very much for the indulgence on extra time this morning. Okay. We thank you. Thank both counsel. The case is submitted.